Filed 4/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ASSOCIATION FOR LOS ANGELES DEPUTY SHERIFFS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ARMANDO MACIAS et al.,<br><br>Defendants and Appellants. | B295086<br><br>(Los Angeles County Super. Ct. No. BC540789) |

APPEALS from a judgment and a postjudgment order of the Superior Court of Los Angeles County.  Victor E. Chavez, Judge.  Judgment amended and affirmed as amended; postjudgment order reversed and remanded.

Coleman Frost, James M. Kilkowski, Tristan F. Mackprang; Benedon & Serlin, Gerald M. Serlin and Judith E. Posner for Plaintiff and Appellant.

Law Office of Donald R. Hall and Donald R. Hall for Defendants and Appellants.

_____

**SUMMARY**

In 2014, the Association for Los Angeles Deputy Sheriffs (ALADS) sued Armando Macias and John Nance (collectively, defendants) for breaches of their fiduciary duty to ALADS as members of its board of directors. The breaches of fiduciary duty occurred after the board removed Mr. Macias as a director and president of ALADS, on the ground he was not qualified under the bylaws to be a director (a requirement for holding an executive office). Defendants refused to accept Mr. Macias's removal, taking what they now downplay as merely "ill-advised" steps to contest the removal and remain in charge. These included informing the staff Mr. Macias was still president; obtaining a cashier's check for $100,000 from a political action committee (PAC) account of ALADS to retain a law firm; purporting to conduct board meetings without a quorum; and so on, causing great disruption in ALADS's management.

ALADS obtained a temporary restraining order requiring return of the $100,000, and several weeks later a preliminary injunction preventing Mr. Macias from claiming to be a director. Four years later, the case was tried to the court over seven days in May 2018. ALADS sought several categories of damages caused by defendants' disruption of ALADS's management, including $7.8 million in compensation for its members, based on a 140-day delay in negotiating a new memorandum of understanding (MOU) with Los Angeles County. ALADS offered lay and expert testimony to prove the $7.8 million of lost salary it sought to recover on behalf of its members. That evidence was admitted without objection from defendants. Defendants then asserted in closing arguments, for the first time in the four-year

2

course of this litigation, that ALADS lacked standing to recover monetary damages on behalf of its members.

The trial court entered judgment for ALADS, awarding damages sustained by ALADS and a permanent injunction, but found ALADS did not have standing to recover monetary compensation for its members. After the judgment was entered, ALADS sought cost-of-proof sanctions (Code Civ. Proc., § 2033.420) from defendants. The court denied the motion.

Both parties appealed. We conclude the trial court did not err in its conclusion defendants breached their fiduciary duties to ALADS, or in its award of damages for harm to ALADS (except in one very minor respect), or in its award of a permanent injunction. The court did err, however, when it concluded ALADS did not have standing to seek the $7.8 million in damages on behalf of its members. ALADS proved those damages without objection from defendants and had standing to do so. We further conclude ALADS was entitled to cost-of-proof sanctions.

Accordingly, we amend the judgment to include the $7.8 million in damages to ALADS's members, affirm the judgment as amended, and remand the matter to the trial court to determine the appropriate amount of cost-of-proof sanctions.

## FACTS

### 1. The Background and the Parties

ALADS is a nonprofit mutual benefit corporation that represents employees of the county sheriff's department and the bureau of investigations in the district attorney's office. Among other things, ALADS represents its more than 7,000 members in contract negotiations that culminate in MOU's governing wages, hours, and other conditions of employment for its members.

3

ALADS has a seven-member board of directors elected by its voting members. The board in turn selects ALADS's officers from among the board members.

The bylaws specify the qualifications necessary for a voting member to be eligible for election as a director. Section 6.05 provides that any voting member "who is a unit representative in good standing, and has attended 75% of the unit representative meetings for the two (2) years immediately preceding the election, is eligible to be elected" as a director. (The parties refer to this as the 75 percent rule.) A director holds office for a two-year term. Section 6.07 specifies that directors "shall be eligible for re-election provided they continue to meet the qualifications required by Section 6.05."

Section 6.09 provides that a quorum "shall consist of four (4) Directors," and that "no business shall be considered by the Board at any meeting at which a quorum . . . is not present."

Section 6.12 governs the removal of directors. Section 6.12 provides in part that the board "may declare vacant the office of a Director . . . (vi) if he/she fails or ceases to meet the qualifications of a Director set forth in Section 6.05 in effect at the beginning of that Director's current term of office."

Defendant Macias was re-elected to the board of directors in November 2013, along with Don Jeffrey Steck and Floyd Hayhurst. Defendant Nance was elected for the first time. The other directors (Mark Divis, George Hofstetter, and Joseph McCleary) were continuing their staggered terms. Mr. Hofstetter, as it turned out, had not complied with the 75 percent rule, having attended only 69 percent of unit representative meetings during the relevant period.

4

The board selected Mr. Macias as president of ALADS, Mr. Nance as vice president, Mr. Hayhurst as secretary, and Mr. Steck as treasurer. Mr. Hayhurst retired from his employment in January 2014, but remained on the board. Whether Mr. Hayhurst was allowed to remain on the board was a point of contention in the trial court but was not raised as an issue on appeal.

In early 2014, four of ALADS's unit representatives, all of them detectives in the sheriff's department, became dissatisfied with Mr. Macias's leadership as ALADS's president. They investigated his qualifications as a director, hoping to find a reason for his removal as director, and consequently as president. They found one. They discovered from attendance records for unit representative meetings that Mr. Macias had attended only 42 percent of the meetings during the two years preceding his reelection to the board. On or around March 5, 2014, they brought this information to the attention of the board and demanded Mr. Macias be removed as a director and president.

After seeking legal advice from an attorney with expertise in corporate law about whether Mr. Macias could properly be removed under the bylaws, the board convened a duly noticed special meeting to consider Mr. Macias's removal on March 7, 2014. The board voted to remove him based on his failure to qualify as a director, holding two votes. The first vote, taken when Mr. Macias had left the meeting, was 4 to 2 in favor of removal (Mr. Nance and Mr. McCleary opposing removal). The second, taken with Mr. Macias voting, was 4 to 3.

## 2. Post-removal Events: The Board and the Shadow Board

Mr. Macias did not challenge his removal by seeking arbitration as permitted by the bylaws or by initiating a legal action. But he did not go quietly.

Defendants sought the advice of an attorney, Steven Ipsen, who was a former deputy district attorney and whose expertise was criminal law. Then, on March 12, 2014, Mr. Nance, who was acting president, convened a board meeting. He read a statement asserting the March 7 vote to remove Mr. Macias was invalid and Mr. Macias was still a director and president. Mr. Macias entered the room and announced he was president. Immediately after that board meeting, defendants convened a staff meeting and told the staff Mr. Macias was still on the board and still in charge. Mr. Hayhurst tried to apologize to the staff for the conflict among the directors, but defendants "started yelling over the top of [Mr. Hayhurst], sort of to drown him out, and saying he doesn't belong here, that kind of thing."

Two days later, on March 14, 2014, four board members (Messrs. Steck, Hayhurst, Hofstetter and Divis) voted to select Mr. Steck as acting president, and three of them (Mr. Hayhurst abstaining) voted to appoint Travis Kelly to fill the vacant board position.

Also on March 14, a law firm acting for defendants (the Baute firm) sent a letter addressed to "Fellow ALADS Board Members, Members and Employees." (Defendants retained the firm without authority from the board and by improperly gaining access to ALADS funds, as described below.)

The Baute letter said ALADS had retained the firm to ensure compliance with ALADS's bylaws; a "renegade Board

6

member, Floyd Hayhurst," had called the March 14 board meeting without proper notice; defendants would "remain in their respective positions" as duly elected board members and officers; and any board member or officer "who attempts to implement any sort of contrived decision undertaken by Floyd Hayhurst" would "be held fully accountable for any and all misconduct, to the fullest extent of the law." The Baute letter also said Mr. Hayhurst had retired from his position as a deputy sheriff on January 30, 2014, and "has no voting rights vis-à-vis the election or removal of a Director."

On March 20, 2014, defendants convened a meeting at which the only directors or purported directors present were defendants and Mr. McCleary. Acting without a quorum, they purported to elect Scott Frayer as a director. Then the four of them took "a variety of other actions," including hiring Steven Ipsen's firm.

Defendants continued their efforts to maintain what the parties now refer to as a "shadow board," and started an alternative website that showed defendants, Mr. McCleary and Scott Frayer as directors. There was "a lot of chatter among the ALADS members about what was going on," expressing concerns "[t]hat without clear authority to outsiders as to who the true board was, that ALADS wouldn't get any respect and we wouldn't be able to accomplish anything, which was what our main goal was, and that was representing its members."

On March 25, 2014, Mr. Ipsen wrote to the sheriff's department, claiming to be ALADS's general counsel and acting on behalf of ALADS. Among many other things, Mr. Ipsen recited allegedly "ultra vires" and unlawful actions taken by the board in removing Mr. Macias and warned the department not to

7

interfere with the internal business of the union.  Among other demands, Mr. Ipsen demanded no change be made in Mr. Macias's "release time" status.  (Under "release time" provisions, ALADS reimburses the county for certain officers' salaries, allowing them to work full-time as officers of ALADS.) The letter shows carbon copies to a raft of county, state, and federal officials.

### 3.     Post-removal Events:  the $100,000 Retainer

Meanwhile, on March 17, 2014, defendants began their efforts to obtain $100,000 from ALADS's bank accounts to use as a retainer for the Baute firm.  They went to the ALADS office of Maria Cecilia Silvestre, ALADS's accountant, who was in charge of issuing checks.  They closed the door of the small office, blocking it, and told her they wanted a $100,000 check payable to the Baute firm.  Ms. Silvestre told them board authorization and an approved contract were required for a check of that size. Mr. Macias continued demanding the check.  Ms. Silvestre felt scared and intimidated and thought she was going to lose her job if she did not give them what they wanted.  She "couldn't think of any other way to make them leave my office," so she offered them a blank check on ALADS's operating account on the condition they would get approval from the acting executive director, John Rees, whose office was a few steps away.  They promised they would do so but they did not.

After defendants left her office, Ms. Silvestre went to Mr. Rees's office and told him what had happened.  Mr. Rees sent defendants an e-mail advising that board approval was required for an ALADS president to obligate association funds over $1,000, and that expenditures must be for legitimate association purposes.  ALADS issued a stop payment on the check, which had

8

been filled out and endorsed by defendants, and the check was not paid by the bank.

The next day, Mr. Macias and attorney Ipsen went to Ms. Silvestre's office, saying they wanted the signature cards for all of ALADS's Wells Fargo accounts. She refused and told them to go to Mr. Rees. Mr. Ipsen said "that we shouldn't involve Mr. John Rees." After they left her office, Ms. Silvestre was trembling, nauseous, and worried about losing her job. She went home early and did not return to work for the next two days. She felt sick and her doctor advised her not to go to work "for a couple of days, at least."

After leaving Ms. Silvestre's office, defendants went to Wells Fargo, and Mr. Nance withdrew $100,000 from one of ALADS's accounts—its state PAC account. With those funds, defendants obtained a cashier's check payable to the Baute firm, and the check was processed that day. There was no board resolution authorizing withdrawal of the funds, and the check was not signed by ALADS's treasurer, as required by its bylaws. When ALADS discovered the withdrawal, it demanded the funds be returned, but they were not returned.

4.      **This Lawsuit**

On March 27, 2014, ALADS filed this lawsuit against defendants, alleging causes of action for breach of fiduciary duty, fraud, constructive fraud, conversion, and declaratory relief.

On April 2, 2014, the trial court entered a temporary restraining order that, among other things, required defendants immediately to cause the Baute firm to return the $100,000 to the ALADS PAC account. The Baute firm returned the funds the next day.

On May 6, 2014, the trial court granted a preliminary injunction. The order prevented defendants from accessing any funds belonging to ALADS and from taking any action with respect to ALADS affairs without approval of the board (consisting of Messrs. Steck, Hayhurst, Nance, McCleary, Hofstetter, Divis and Kelly); and enjoined Mr. Macias from entering ALADS's headquarters and from claiming to be a director.

The case went to a seven-day court trial four years later, in May 2018. The trial included Mr. Nance's cross-complaint for indemnity under the bylaws for his costs and attorney fees incurred in defending the action.

ALADS presented evidence establishing the facts we have described, as well as evidence of damages caused by defendants' breaches of fiduciary duty. The most substantial damages claim was for $7.8 million in lost salary increases due to the disruption defendants caused to ALADS's operations, which in turn delayed its negotiation of a new MOU with the county. Defendants had never contended ALADS could not recover monetary damages on behalf of its members and did not object to ALADS's lay and expert evidence to prove these damages. In closing argument, defendants contended for the first time that ALADS did not have standing to assert the claims of its members for the delay in the pay raise.

On June 8, 2018, after receiving posttrial briefs, the trial court issued a minute order. The court concluded ALADS had standing, proved liability and causation with respect to the damages for the delay in negotiation, and could recover all the other items of damages ALADS itself had incurred. The court ordered ALADS to file a computation of damages, and later ruled

10

that defendants had not identified any defects in the computation.

Both parties requested a statement of decision, the court ordered ALADS to prepare it, and ALADS did so. Defendants filed objections, including that an association does not have standing to assert a claim for money damages on behalf of its members, and that ALADS could recover damages only for harm to itself.

On November 13, 2018, the court sustained defendants' objection to ALADS's recovery of the $7.8 million in damages to its members, concluding that an association has standing to sue on behalf of its members only if it brings a class action, and ALADS had not done so. The court deleted paragraphs from the proposed statement of decision in support of the $7.8 million damages award and reduced the award in favor of ALADS to $75,190.98.

The court entered judgment for ALADS the same day on all causes of action, in the amount of $75,190.98, plus postjudgment interest. The judgment decreed that Mr. Macias was properly removed, and that neither defendant was entitled to indemnification under the bylaws. Both defendants were enjoined from representing they are officers or directors of ALADS, from entering the ALADS offices, and from accessing any financial accounts held by or for the benefit of ALADS.

On January 9 and 10, 2019, both ALADS and defendants filed timely appeals from the judgment.

Before the appeals were filed, on December 4, 2018, ALADS filed a motion for costs of proof under Code of Civil Procedure section 2033.420. ALADS had served defendants with requests for admissions in May 2014. ALADS sought costs of proof based

11

on defendants' failure to admit, in their responses served in 2015, the truth of basic matters. Most of the requests related to the $100,000 withdrawal, and Mr. Macias also failed to admit the genuineness of the bylaws, the $100,000 Wells Fargo withdrawal slip, and the cashier's check.

The trial court denied the motion, and ALADS filed an appeal from that postjudgment order. We consolidated the two appeals. We will address ALADS's appeal first, as it presents the most significant issue, whether ALADS has standing to recover the $7.8 million in lost salary on behalf of its members.

**DISCUSSION**

**1.      ALADS's Appeal**

We begin by highlighting what is *not* in dispute in ALADS's appeal. Defendants do not contend on appeal there was no substantial evidence to support a finding that ALADS's members sustained $7.8 million in damages. As we summarized above, after hearing the evidence and arguments at trial, the court initially made findings of fact in support of a judgment for ALADS including the $7.8 million to compensate its members. The court found in its proposed statement of decision that ALADS was about to begin preparations for negotiating a new MOU with the county before Mr. Macias's removal. The trial court initially found ALADS proved the following.

Will Aitchison, John Rees, and Derek Hsieh (ALADS's then-current executive director) "testified credibly that [defendants'] breaches of their fiduciary duties disrupted ALADS' ability to prepare for and engage in those negotiations, causing a delay of at least six months in the signing of a new MOU. The net result of Defendants' breaches of their fiduciary duty was that ALADS' members lost increases in salary and benefits for

12

six months.  Among other things, [defendants'] actions and the very public letters sent by their attorneys on March 14, 2014 and March 25, 2014 challenging the validity of ALADS' Board's authority created confusion among ALADS' own staff, made it difficult to recruit a new executive director to head the negotiation process, and disrupted ALADS' relationships with the other parties in the negotiation process . . . ."

Mr. Aitchison, Mr. Rees and Mr. Hsieh "all testified that the same increase in salary benefits ultimately obtained by ALADS . . . could have been obtained six months earlier if ALADS' operations had not been disrupted by [defendants'] conduct in breach of their fiduciary duties."  The court summarized the testimony of ALADS's forensic economist, Ted Vavoulis, stating "Mr. Vavoulis calculated the amount of salary that ALADS' members ultimately lost as a result of the delay in negotiations caused by [defendants].  Based on a detailed analysis of the salaries of each of ALADS' members, Mr. Vavoulis calculated the aggregate loss to ALADS' 7,440 members at $55,813.00 per day, which represents the differential between their salaries under the new MOU and the prior MOU."  While Mr. Aitchison testified the delay was at least six months, "Mr. Vavoulis conservatively calculated the damages caused by a 140-day delay.  The total damages suffered by ALADS' members during the 140-day delay . . . is $7,813,833.00."

With the testimony of Mr. Vavoulis, ALADS established the exact amount of the damages its members incurred in lost salary increases.  ALADS's proof did not require any member's participation.  In its posttrial minute order, following closing briefs and preceding the proposed statement of decision, the court observed that ALADS supported its claim for damages by offering

13

expert evidence calculating the losses, and defendants made no contrary showing. Defendants never objected to the expert's testimony or to the documentation he presented.

After issuing its proposed statement of decision, as we have described, the court was persuaded by defendants' late claim that ALADS lacked standing to recover damages on behalf of its members. The trial court concluded an association has standing to sue on behalf of its members only if it acts as a class representative. Since ALADS did not bring a class action, the court concluded it did not have the right to bring a claim for loss of the $7.8 million in salary benefits to its members. In this respect, the court erred. The class action analysis the court used is not the proper test for associational standing.

### a. Associational standing

The federal rule on an association's standing to sue on behalf of its members is stated in *Hunt v. Washington State Apple Advertising Com.* (1977) 432 U.S. 333 (*Hunt*), which has been cited thousands of times: "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Id.* at p. 343.)

California courts have used the same test. In *Brotherhood of Teamsters & Auto Truck Drivers v. Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515 (*Teamsters*), several unions sought a writ of mandate to compel the defendant board to set aside a decision to deny unemployment insurance benefits to individual union members. (*Id.* at p. 1518.) *Teamsters* rejected

14

the defendant's contention the unions lacked standing to bring the action on behalf of their members, quoting and applying the *Hunt* decision. (*Teamsters,* at pp. 1522–1523.) The court found the three *Hunt* criteria were satisfied. (*Teamsters,* at pp. 1522–1523; *id.* at p. 1523 [stating, as to the third criterion, that "the unions may litigate this case without the participation of its members and still insure that the remedy, if granted, will inure to the benefit of those union members who have been injured"]; see generally *United Farmers Agents Assn., Inc. v. Farmers Group, Inc.* (2019) 32 Cal.App.5th 478, 488 ["California courts have applied the doctrine [of associational standing], including the three *Hunt* requirements," citing cases].)

In this case, defendants do not challenge the existence of the first two *Hunt* criteria, nor could they. Plainly, the members of ALADS "would otherwise have standing to sue in their own right" for the loss of their salary increases and, just as plainly, the interest ALADS seeks to protect is "germane to the organization's purpose." (*Hunt, supra,* 432 U.S. at p. 343.)

Defendants contend, however, that ALADS has not satisfied the third prong of the *Hunt* test. Under *Hunt*, if the first two criteria are met, an association *does* have standing if "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Hunt, supra,* 432 U.S. at p. 343; *Teamsters, supra,* 190 Cal.App.3d at p. 1522.) As summarized above, *ALADS proved its lost compensation damages without calling any individual ALADS member*. ALADS relied on lay and expert testimony, which was admitted in evidence without objection, and which the court initially found was sufficient to prove causation and the $7.8 million amount of damages.

15

Defendants now tell us ALADS cannot "use a formula presented through the testimony of a valuation expert to avoid the third prong of the *Hunt* test." We are dumbfounded by this. The short answer to defendants is, that ship already sailed. Defendants made no objection at any time before closing argument to ALADS's proof in support of the relief requested on behalf of its individual members, and defendants do not claim on appeal there is no substantial evidence to support the award of $7.8 million in lost compensation. By the time the trial had proceeded to closing argument, it was far too late—and it remains far too late—for defendants to say ALADS cannot do what it has already done.

Defendants cite a raft of federal and sister state cases which they say establish an association can never seek damages on behalf of its members. We find it incongruous to engage in an extended discussion of any of those cases, since none of them, of course, found an association lacked standing to prove damages that the association had already proved after a trial without individual testimony. We will address a few of defendants' authorities, however, to show they would not have supported defendants' position even if defendants had challenged ALADS's standing before trial.

In *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.* (D.C.Cir. 1986) 806 F.2d 1093 (*Allnet*), the plaintiff was a nonprofit association concerned with promoting fair rates for communications services. The association alleged the defendant had charged customers different rates for the same service and changed its rates without public notice. The association sought damages on behalf of its allegedly overcharged members. (*Id.* at pp. 1093–1094.) The

16

court found the association lacked standing because "the money damages claims [the association] seeks to advance are the kind that ordinarily require individual participation, so that [the association] may not proceed in the format it has selected." (*Id.* at p. 1095.) But the court explained how it reached that conclusion, and its reasons show how different this case is from *Allnet*.

*Allnet* observed the association had identified only five or six of its 12,000 members with a concrete stake in the outcome and reasoned it would be inequitable to permit the association to avoid the responsibilities and safeguards of a class action. (*Allnet, supra,* 806 F.2d at p. 1096; *ibid.* ["It asks to be declared representative of the few (five or six), not the many, whether the comparison group is all [association] members or all [defendant] subscribers."].)

The court then expressly "reiterate[d] that our decision establishes no *per se* rule that associations may never represent their members when monetary relief is immediately at stake." (*Allnet, supra,* 806 F.2d at p. 1096.) And, the court stated its decision did not "prejudge a case for damages in which the association possesses a special representational responsibility to the members on whose behalf it sues," citing cases involving labor unions. (*Ibid.*; see *id.* at pp. 1096–1097.)

This is not a case where ALADS is seeking damages for only a few of its members, as in *Allnet*. Every member was affected by the loss in salary, and ALADS has the "special representational responsibility" *Allnet* mentions. (*Allnet, supra,*

17

806 F.2d at p. 1096.)  In short, defendants' reliance on *Allnet* does not advance their position.[1]

Defendants also discuss and distinguish *United Automobile Workers v. Brock* (1986) 477 U.S. 274 (*Brock*).  There, applying the *Hunt* criteria, the high court held the UAW had standing to challenge the Secretary of Labor's policy directive allegedly resulting in denial of benefits to thousands of union members. (*Brock,* at pp. 281, 287–288.)  The court found neither the claims nor the relief sought required the trial court "to consider the individual circumstances of any aggrieved UAW member."  (*Id.* at p. 287.)

In *Brock*, the lawsuit raised "a pure question of law: whether the Secretary properly interpreted the [statute's] eligibility provisions."  (*Brock, supra,* 477 U.S. at p. 287.)  *Brock*

---

[1]    Defendants cite two other federal cases that have repeated the mantra that "no federal court has allowed an association standing to seek monetary relief on behalf of its members." (*United Union of Roofers v. Insurance Corp. of America* (9th Cir. 1990) 919 F.2d 1398, 1400; see also *Committee To Protect Our Agricultural Water v. Occidental Oil & Gas Corp.* (E.D.Cal. 2017) 235 F.Supp.3d 1132, 1169.)  But these are cases where the participation of individual members was required and so the third *Hunt* factor was not met.  In *Roofers*, for example, the court held the union did not have standing to assert the rights of members who sought payment of past wages from a payment bond issued by the defendant.  (*Roofers,* at p. 1399.)  The court was explicit:  "In this case, it is clear that individual Union members will have to participate at the proof of damages stage. There is no escaping the fact that the Union in this case cannot overcome the third hurdle placed before it by Supreme Court precedent."  (*Id.* at p. 1400.)  *Occidental* simply followed *Roofers.* (*Occidental,* at p. 1170.)

18

concluded: "Thus, though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.' " (*Id.* at p. 288.)

Defendants point out that, unlike *Brock*, this case does *not* involve a "pure question of law" or any "third-party administrator to determine and distribute the appropriate amount of money for each member's claim." That is true but, so far as we can see, irrelevant. The circumstances here and in *Brock* are entirely different, but the principles to be applied to the circumstances are not. *Brock* does not stand for the proposition that standing is proper only where a pure question of law is at issue. And *Brock* does not tell us that a "third party administrator" is necessarily required. What *is* the same here as in *Brock* is that ALADS could *and did* litigate this case without the participation of any individual claimants, and there is no basis on which we might find ALADS cannot ensure that the remedy " 'will inure to the benefit of those members of the association actually injured.' " (*Brock, supra,* 477 U.S. at p. 288.)

In another argument, defendants shift course and rely, as the trial court did, on *National Solar Equipment Owners' Assn., Inc. v. Grumman Corp.* (1991) 235 Cal.App.3d 1273 (*National Solar*). In *National Solar*, the court stated that "[a]n association which has not itself been injured has standing to sue on behalf of its members only if it acts as a class representative." (*Id.* at p. 1280.) While that was so under the facts in *National Solar*, it is not so as a universally applied principle.

19

*National Solar* was an appeal by an association (a nonprofit corporation whose members were investors in solar equipment) from a trial court order denying class certification. (*National Solar, supra,* 235 Cal.App.3d at p. 1276.) The trial court had ruled that the case should proceed as a class action, rather than as a representative action, and then denied class certification. (*Id.* at pp. 1278, 1279.) The Court of Appeal agreed the case had to proceed as a class action, making the statement quoted above, and then reversed the order denying class certification. (*Id.* at pp. 1280, 1286.)

*National Solar* does not discuss or mention the *Hunt* criteria that govern associational standing. And we do not disagree with the court's conclusion the circumstances in *National Solar* required a class action: the plaintiff sought damages on behalf of its members that included tax penalties and down payments by its members (*National Solar, supra,* 235 Cal.App.3d at p. 1278), thus requiring the individualized proof of damages that is permitted in a class action. The plaintiff would not have had standing under *Hunt* to sue on behalf of its members in any event.

In short, *National Solar* is not inconsistent with *Hunt,* and its statement that an association has standing only if it acts as a class representative, when extracted from its context, is simply inapt and overbroad, as the *Hunt* and *Teamsters* lines of cases, as well as other cases arising in different contexts, clearly establish. (See, e.g., *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327, 337 ["a union may bring a representative action on behalf of its members"].) The *Hunt* and

20

*Teamsters* standard applies here, and that standard has been met.[2]

Finally, defendants tell us that, even if ALADS has standing, "the trial court found in favor of [defendants] on causation and damages" for the delayed salary negotiations. That is patently not the case. The trial court struck its findings on causation and damages only because the court erroneously determined ALADS did not have standing to sue on behalf of its members. This is clear from the trial court's ruling itself, as well as from the court's earlier rulings.

To recap those rulings: In its June 8, 2018 minute order following closing briefs, the court stated that ALADS provided evidence defendants' breaches of fiduciary caused a six-month delay in obtaining increased salary benefits; ALADS supported its claim for damages by offering expert evidence calculating the losses; and defendants made no contrary showing. In its subsequent findings concerning the computation of damages, the court described the expert's evidence; concluded the evidence showed "$7,813,833 is the damages suffered by [ALADS's] members" and "a proper value for the damages caused by the

---

[2] ALADS also refers us to a line of Washington state cases that take a slightly different approach to *Hunt*'s third criteria. These authorities find unions have standing to seek monetary relief on behalf of their members in cases where "the amount of monetary damages sought on behalf of those members is certain, easily ascertainable, and within the knowledge of the defendant." (E.g., *International Assn. of Firefighters, Local 1789 v. Spokane Airports* (Wash. 2002) 45 P.3d 186, 190.) We see no need to consider these authorities.

Defendants' breach of their fiduciary duties"; and defendants "have not identified any defects" in the computation of damages.

And finally, in its ruling on defendants' objections to the proposed statement of decision, the court once again described ALADS's evidence and concluded ALADS "provided evidence that the aggregate loss to the members was $55,813.00 per day and that the total damages would be $7,813,833 for the 140-day delay." Then the court concluded that, since ALADS did not have standing to bring the claim, ALADS "may not recover the $7,813,833.00," and stated "[t]his will remove" the portions of the statement of decision discussing causation and damages for the delay in salary negotiations.

In sum, there is no doubt the court found both causation and $7,813,833 in damages from the delayed negotiations. We have reviewed defendants' remaining arguments (that ALADS cannot disburse any monetary award to its members, and is a corporation that cannot assert the rights of others), and conclude they are equally without merit.

### b.     Costs of proof

Under Code of Civil Procedure section 2033.420, "[i]f a party fails to admit the genuineness of any document or the truth of any matter when requested to do so . . . , and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees." (*Id.*, subd. (a).)

The court "shall make this order" unless it finds any of the following: "(1) An objection to the request was sustained or a

response to it was waived . . . . [¶] (2) The admission sought was of no substantial importance. [¶] (3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter. [¶] (4) There was other good reason for the failure to admit." (Code Civ. Proc., § 2033.420, subd. (b).)

We review the trial court's denial of a motion for costs of proof for abuse of discretion, and we find abuse of discretion in this case.

### i. The requests

ALADS served both defendants with 28 requests for admission of the truth of matters and served Mr. Macias with three requests to admit the genuineness of documents. Most of the requests involved defendants' conduct relating to their withdrawal of $100,000 from ALADS's PAC account. Mr. Macias denied 14 of them and stated he lacked sufficient information to enable him to admit or deny 14 of them. Mr. Nance denied 11 requests, and admitted or partially denied or lacked sufficient information to respond to the others. By way of example, both defendants denied their withdrawal of the $100,000 violated sections 11.01 and 11.02 of the bylaws, which it clearly did.[3]

---

[3] Section 11.01 provides the board of directors may "by resolution authorize any officer or agent" to enter into any contract or execute and deliver any instrument. Section 11.02 provides that, except as specifically determined by resolution as provided in section 11.01, checks and other evidences of indebtedness of the corporation "shall be signed by the Treasurer or the Assistant Treasurer and countersigned by the President or the Vice President of the Corporation." (There were no board resolutions and the treasurer signed nothing relating to the $100,000.)

23

Both denied they returned the money they withdrew after April 2, 2014 (when the temporary restraining order was issued). Both denied requests to admit they had no board resolution, and sought none, allowing them to retain the Baute law firm and give it the $100,000 check. They denied this was a breach of their fiduciary duties to ALADS.

Both defendants also denied that voting to appoint Scott Frayer as a director was a breach of their fiduciary duty. (Defendants and Mr. McCleary voted to appoint Mr. Frayer at a meeting they held without the necessary quorum of four directors.) Mr. Macias also responded he lacked sufficient information to admit or deny the genuineness of the bylaws, the $100,000 Wells Fargo withdrawal slip, and the cashier's check for $100,000 to the Baute firm. A recitation of the other requests and responses appears in the next footnote.[4]

---

[4] Mr. Macias denied a request to admit he converted the $100,000 (as did Mr. Nance). Mr. Macias denied requests to admit that "there was no resolution by a majority of ALADS's Board of Directors allowing [him] to withdraw $100,000 from ALADS's PAC on March 18, 2014" (Mr. Nance admitted this); Mr. Macias denied that Mr. McCleary (another director and Macias supporter) "never sought to obtain a resolution from a majority of ALADS's Board" before he (Mr. Macias) withdrew the $100,000 (Mr. Nance admitted Mr. McCleary never sought a resolution but denied "withdrawing" money). Mr. Macias denied that ALADS owns all funds in the PAC (Mr. Nance said he had insufficient information), and denied that ALADS owns the $100,000 he withdrew (Mr. Nance's response is unclear).

In addition, Mr. Macias responded he was unable to admit or deny 14 requests, including requests to admit that he "served as ALADS's President from December 2013 to May 6, 2014"; that he served as a director during that time; that he owed ALADS a

### ii. ALADS's motion

After the judgment was entered, ALADS sought to recover its costs to prove the truth of the matters defendants failed to admit. ALADS's motion asked for costs of proof "in a range from $248,354.13 to $683,382.69," and proposed three different ways the court could quantify the costs, none of them involving allocation to any particular requests for admissions.

---

fiduciary duty when he served as president and director; and that the only members of the board "to vote to appoint Scott Frayer as a director of ALADS" were defendants and Mr. McCleary. (Mr. Nance admitted similar requests.) Other responses in the insufficient information category involved the $100,000. Mr. Macias lacked sufficient information to admit or deny that he "never sought to obtain a resolution from a majority of ALADS's Board of Directors before [he] withdrew $100,000 from ALADS's PAC on March 18, 2014" (Mr. Nance admitted never seeking a resolution but denied he "withdrew" money). Mr. Macias lacked sufficient information to admit or deny that ALADS's treasurer did not sign the check he paid to the Baute law firm, and that he did not request the treasurer to do so (Mr. Nance admitted these); that he withdrew $100,000 from ALADS's PAC on March 18, 2014 to retain the Baute firm (Mr. Nance denied as to "withdrawing" money but admitted the $100,000 was being used to retain the firm); that he gave the firm a cashier's check for $100,000 from ALADS's PAC (Mr. Nance admitted this); that he did not own the $100,000 (Mr. Nance admitted he did not own it in his individual capacity); that "Bruce Nance does not own the $100,000 you withdrew" from the PAC (Mr. Nance lacked sufficient information to admit that Mr. Macias did not "own" the funds); and that he "did not receive any advice from legal counsel stating that [he was] authorized to withdraw $100,000" from the PAC (Mr. Nance denied this).

25

ALADS submitted declarations from counsel Tristan Mackprang (one as to Mr. Macias and one as to Mr. Nance). Mr. Mackprang attached to both declarations Exhibit M, a 54-page summary containing 1,127 billing entries for fees he stated were attributable to Mr. Macias's (or Mr. Nance's) refusal to admit requests for admissions.

Mr. Mackprang explained that his office manager identified all cost and time entries billed to ALADS from March 20, 2015 (the date of Mr. Macias's final responses) through October 31, 2018 (the last billing before the court's November 13, 2018 statement of decision). These cost and time entries totaled about $830,000. Mr. Mackprang "evaluated the time entries . . . and removed all charges unrelated to proving the admissions sought from Nance . . . and [Mr. Macias] that are the subject [of the] motion." Mr. Mackprang "further revised this Excel file by allocating each time entry . . . to either Macias or Nance, or to both defendants as appropriate, based on [Mr. Mackprang's] particularized review of each such entry to determine to what matter it related."

Mr. Mackprang's allocations resulted in fees and costs attributable to Mr. Macias individually ($45,975.92); those attributable to Mr. Nance individually ($224,514.49); and those attributable to both defendants ($458,868.20). Consequently, Mr. Mackprang stated, fees and costs to prove facts that Mr. Macias improperly refused to admit totaled $504,844.12. Fees and costs to prove the facts that Mr. Nance improperly refused to admit totaled $683,382.69. ALADS then halved these figures to account for commonality of issues, and asked for $252,422.06 in costs and fees for Mr. Macias's refusals, and $341,691.35 in costs and fees for Mr. Nance's refusals.

26

Mr. Mackprang also offered the trial court two alternatives for calculating costs and fees attributable to each defendant. The first alternative calculation consisted of fees and costs incurred by ALADS from August 24, 2016 ("when ALADS's counsels' preparation for the trial . . . started in earnest") to October 31, 2018. For both defendants, this total was $454,233.36. Then, ALADS calculated 93 percent of that total ($422,437.02), and offered that figure as the amount of fees caused by defendants' refusals to admit. This calculation was based on the portion of the 46-page statement of decision (93 percent) that remained intact after the court crossed out the parts concerning the $7.8 million in damages from delayed MOU negotiations. "In other words, ALADS prevailed on 93% of the issues in the Statement of Decision. As such, ALADS should be entitled to 93% of the costs and fees incurred from at least August 24, 2016 forward." The other alternative (third scenario) was the same as the second scenario, except it began the calculation from April 26, 2018, a month before trial. This total was $267,047.45, 93 percent of which is $248,354.13.

Thus, in its motion for costs of proof from Mr. Macias, ALADS sought an award "in the amount from $248,354.13 [third scenario] to $504,844.12 [first scenario]." From Mr. Nance, ALADS sought an award "in the amount from $248,354.13 [third scenario] to $683,382.69 [first scenario]."

### iii.    Defendants' opposition

Defendants' opposition argued, among other things, that costs of proof must be segregated and tied directly to each specific request for admission; defendants had reasonable grounds to believe they would prevail on the conversion claim; and it was not

27

unreasonable for Mr. Macias to believe he had not been lawfully removed from the board.

Defendants also argued Mr. Mackprang's summary was inadmissible hearsay and was based on impermissible conclusions, opinions and argument.

### iv.   The trial court's ruling

The court denied ALADS's motion on three different grounds. The first was that it had no jurisdiction after the parties filed notices of appeal on January 9 and January 10, 2019. The second was that some of defendants' denials (the statements of insufficient information) were not unequivocal denials, and that while other denials were unequivocal, ALADS's motion did not identify the specific fees and costs incurred to prove the matters that were unequivocally denied. The third ground was the exception stated in Code of Civil Procedure section 2033.420, subdivision (b)(3), that defendants had reasonable grounds to believe they would prevail on two issues: the conversion claim (because of their asserted belief ALADS had no standing to make the claim on behalf of its PAC), and their refusal to admit it was a breach of fiduciary duty to appoint Scott Frayer to the board (which they purported to do without a quorum).

As noted at the outset, we conclude the trial court abused its discretion in denying costs of proof on each of the grounds stated.

First, the court erred in finding it had no jurisdiction because notices of appeal had been filed before the hearing was held on the motion. ALADS correctly points out that an appeal does not stay proceedings on " 'ancillary or collateral matters which do not affect the judgment [or order] on appeal' even

28

though the proceedings may render the appeal moot." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 191.) Defendants do not argue otherwise. The court retained jurisdiction to rule on the motion.

Second, we disagree with the trial court's view that costs of proof are unauthorized as to responses to requests for admission that indicate a lack of sufficient information. That may be so in some cases, but it is not so here.

The trial court appears to have reasoned that, where a response is incomplete, the party requesting the admission must make a motion to compel further responses, or else that party waives any right to compel a further response.[5] Here, there was no motion to compel after the operative responses were filed.[6] Defendants' response that they had insufficient information to admit or deny matters that they clearly knew or should have known is a complete (and sanctionable) response. If a party has provided "complete responses to the requests," then there is

---

[5] Costs are not awarded if the court finds an objection to a request was sustained "or a response to it was waived under Section 2033.290." (Code Civ. Proc., § 2033.420, subd. (b)(1).) Section 2033.290 authorizes motions to compel if an answer is deemed evasive or incomplete, and if a motion is not made within the specified time, the requesting party waives any right to compel further responses. (§ 2033.290, subds. (a) & (c).)

[6] The operative responses are Mr. Macias's first amended supplemental responses on March 20, 2015, and his July 8, 2015 responses to the requests to admit the genuineness of documents. Mr. Nance's operative responses are his third supplemental responses on October 29, 2015. There were no motions to compel further responses (there had been motions and even sanctions awarded with respect to defendants' previous responses).

"nothing to address in a motion to compel," so "no motion to compel further responses [is] necessary," and the requesting party does not waive its right to cost-of-proof fees. (*American Federation of State, County & Municipal Employees v. Metropolitan Water District* (2005) 126 Cal.App.4th 247, 269.)

An "insufficient information" response may constitute a "failure to admit" as specified in the statute. The statute does not use the term "denial"; it allows a party to seek costs of proof for the other party's "failure to admit." (Code Civ. Proc., § 2033.420, subd. (a) ["fails to admit"] & (b)(4) ["failure to admit"].)

Defendants had a duty to make a reasonable investigation of the facts. As one court has explained, "where it becomes clear from evidence introduced by either party at trial that the party who denied for lack of information or belief had access to the information at the time requests for admissions were propounded, sanctions are justified because that party has a duty to investigate [citations]. In the absence of investigation, it becomes apparent the denial is without good reason and/or that the statement as to lack of information was false." (*Smith v. Circle P Ranch Co., Inc.* (1978) 87 Cal.App.3d 267, 275; see also *Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 691 ["Since RFAs are not limited to matters within the personal knowledge of the responding party, that party has a duty to make a reasonable investigation of the facts."].)

The trial court gave two examples of "insufficient information" responses for which it concluded costs of proof were not authorized. One was Mr. Macias's response that he had "insufficient information" as to the genuineness of the bylaws, on the basis that the request was "unclear, vague and ambiguous" as

30

to the date the bylaws were "adopted, ratified, implemented or promulgated." The other was Mr. Nance's response that he had insufficient information to admit that Mr. Macias did not "own" the $100,000.

Both of these are "failure[s] to admit" matters that obviously should have been admitted—at the very least, defendants had a duty to investigate and, had they done so, they would have known the bylaws were genuine and Mr. Macias did not own the $100,000. Accordingly, the trial court abused its discretion in concluding costs of proof were not authorized as to the responses it identified.

The court's third reason for denying sanctions was also error. The court found defendants had a reasonable ground to believe they would prevail on the conversion claim "because they believed that ALADS did not have standing to assert the claim on behalf of the PAC, which is a political action committee." In addition, the court found defendants had a reasonable ground to deny the request to admit that voting to appoint Scott Frayer a director was a breach of fiduciary duty, because the evidence at trial showed the 75 percent rule had not been enforced uniformly. Neither of these conclusions survives scrutiny.

Defendants presented no evidence to dispute that the PAC account belonged to ALADS. "To justify denial of a request, a party must have a '*reasonable* ground' to believe he would prevail on the issue. [Citations.] That means more than a hope or a roll of the dice." (*Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 532.) Whatever defendants may have believed about their contention ALADS lacked standing to recover the funds in its own PAC account, nothing prevented them from admitting the

31

facts they were asked to admit related to their taking $100,000 from the PAC account and returning it 17 days later.

Defendants had no reasonable ground to deny that voting to appoint Scott Frayer to the board was a breach of fiduciary duty (or to deny, as Mr. Macias did, that only defendants and Mr. McCleary had voted to appoint Mr. Frayer).  The trial court's reference to evidence that the 75 percent rule was not uniformly applied does not change this.  Failure to apply the 75 percent rule uniformly might arguably justify defendants' belief that Mr. Macias should not have been removed, but it does not justify conduct in brazen violation of ALADS's bylaws.  The vote to appoint Mr. Frayer as director was taken by only three directors, and under the bylaws, no business may be considered without a quorum, which "shall consist of four (4) Directors."  As the trial court later concluded, the purported election of Mr. Frayer and ensuing actions after his supposed election were in violation of clear provisions of the bylaws, and "breached [defendants'] duties of due care and loyalty."

In sum, the trial court abused its discretion when it denied costs of proof, as each ground for denial was legally unsound.

Defendants insist that ALADS did not carry its burden of proof in the first instance, and that the decision to deny costs of proof should be upheld on that basis.  They say the trial court was correct when it observed that ALADS's motions did not identify "the specific attorney's fees and costs incurred to prove the matters in each, specific request for admission that was denied by the Defendants."  In addition, they contend the 54-page summary Mr. Mackprang prepared, listing the billing entries for fees he stated were attributable to Mr. Macias's (or Mr. Nance's)

refusal to admit ALADS's requests, was inadmissible hearsay to which they objected. We disagree on both points.

The statute does not require that fees and costs must be separately allocated to each specific request for admission, particularly not where, as here, virtually all the requests relate to a single issue: liability for defendants' breaches of fiduciary duty in connection with the $100,000 withdrawal and use of ALADS's funds. The rule is that a party cannot recover costs of proof for *other* issues. In *Garcia,* for example, the defendant's evidence seeking costs of proof for 15 requests for admissions appeared to include fees for issues that "were completely outside the scope of the request for admissions." (*Garcia v. Hyster Co.* (1994) 28 Cal.App.4th 724, 736, 737.) The court remanded the matter for redetermination of the costs and fees. (*Id.* at pp. 737–738.)

We also reject defendants' claim that Mr. Mackprang's summary, listing all the billing entries he asserted were attributable to defendants' failures to admit, was inadmissible hearsay. Declarations of counsel are regularly presented as evidence supporting attorney fee requests. The information in Exhibit M to Mr. Mackprang's declaration, provided under oath and compiled under his direction from his personal review of his firm's billing records, was admissible.

In sum, the trial court was required by Code of Civil Procedure section 2033.420 to award ALADS its reasonable expenses incurred in proving matters defendants failed to admit without reasonable grounds to do so. On remand, the trial court has the discretion to determine whether defendants had reasonable grounds for failing to admit any specific request for admission not otherwise disposed of in this opinion. And the

33

court has the discretion to determine the amount of reasonable expenses, to receive further evidence should it choose to do so, and to exclude any claimed expenses to the extent they relate to issues outside the scope of the requests for admission. What it cannot do is deny costs of proof that are mandated by statute.

## 2. Defendants' Appeal

Defendants assert error in six categories.

They contend that, as a matter of law, they did not violate their fiduciary duty to ALADS when they refused to acquiesce to Mr. Macias's removal from the board based on the 75 percent rule.

They contend their conduct after Mr. Macias's refusal to acquiesce to his removal did not breach any fiduciary duty or cause any damage.

They contend the court erred in awarding each of the items of damages to ALADS.

They contend ALADS does not have standing to assert any claims concerning their withdrawal of money from ALADS's PAC because those claims belong to the PAC.

They contend ALADS is not entitled to a permanent injunction or to declaratory relief.

They contend the trial court erred in deciding defendants were not entitled under the bylaws to indemnity for their expenses in defending this case.

With one (exceedingly minor) exception, none of these claims has merit.

### a. Defendants' "refusal to acquiesce" in Mr. Macias's removal

Defendants contend Mr. Macias's removal was invalid, and therefore they did not breach their fiduciary duty to ALADS by

34

refusing to acquiesce. The removal was invalid, they say, because the 75 percent rule does not apply to sitting directors running for reelection, and because only three of the four directors who voted to remove him were qualified to vote.

We are not persuaded by defendants' claim the 75 percent rule did not apply to sitting directors. Defendants cite evidence they say proves this claim but the trial court did not have to credit that evidence. The trial court concluded otherwise, and the bylaws clearly support the trial court's conclusion.

Nor was Mr. Macias's removal invalid, as defendants claim, for lack of sufficient votes from qualified directors. Defendants focus on Mr. Hofstetter, who had also failed to comply with the 75 percent rule when he was reelected in 2012. But the bylaws give the board the discretion to remove a director; it is not required to do so. Section 6.12 provides that the board "may declare vacant the office of a Director . . . (vi) if he/she fails or ceases to meet the qualifications . . . ." Moreover, under the Corporations Code, if no action challenging the validity of the election of a director is brought, "in the absence of fraud, any election . . . of a director is conclusively presumed valid nine months thereafter." (Corp. Code, § 7527.) That rule applied to Mr. Hofstetter.

More to the point, defendants' belief that Mr. Macias's removal from the board was invalid did not justify their egregious behavior. Defendants characterize their conduct after Mr. Macias's removal as a passive "refusal to acquiesce" in the removal. A mere "refusal to acquiesce" is not necessarily a breach of fiduciary duty. But the form that refusal takes may well be a breach. Defendants could have challenged Mr. Macias's removal by taking the avenue provided in the bylaws—

35

arbitration, or, if they believed that provision did not apply, they could have filed a legal challenge.[7]  Instead, defendants engaged in egregious conduct that was not in the best interests of ALADS—and indeed that ultimately caused, as witnesses testified and the trial court found, salary losses for every member of ALADS.

The trial court found defendants ignored the expert legal advice given to the board that Mr. Macias's removal was proper. They ignored the clear terms of the bylaws.  They sought contrary legal advice from Mr. Ipsen, a criminal lawyer, without investigating his qualifications to give them advice on matters related to corporate governance.[8]  They convened a board meeting and a contentious staff meeting at which Mr. Macias insisted he was in charge of ALADS.  Through their attorneys, Mr. Ipsen and

---

[7]    Article IV (Membership) of the bylaws states in section 4.13 that "[a]ll controversies arising from these Bylaws including, but not limited to . . . any dispute which may give rise to a cause of action in contract or tort or based on any theory or statute . . . are to be resolved exclusively by final and binding arbitration."  The Corporations Code also recognizes actions to challenge the validity of the removal of a director.  (Corp. Code, § 7527 ["An action challenging the validity of any election, appointment or removal of a director or directors must be commenced within nine months after the election, appointment or removal.  If no such action is commenced, in the absence of fraud, any election, appointment or removal of a director is conclusively presumed valid nine months thereafter."].)

[8]    The trial court found "the most reasonable inference from the evidence is that neither Mr. Nance nor Mr. Macias cared whether the advice given by Mr. Ipsen was competent so long as it was what they wanted to hear and furthered their desire to promote their own authority and positions within ALADS."

36

Mr. Baute, they published letters to third parties, in one case including the sheriff's department and other county, state and federal officials misrepresenting, among other things, that Mr. Macias was the president of ALADS. They held a board meeting without a quorum and purported to elect another director, creating a "shadow board." They created an alternative website for ALADS. And, of course, they illegally withdrew $100,000 of ALADS's funds to retain attorneys to assist them in advancing Mr. Macias's claims. These actions are not fairly viewed as some passive "refusal to acquiesce." These actions violated defendants' fiduciary duty to ALADS.

### b.     Conduct after removal

Defendants argue their conduct "did not breach any fiduciary duty or cause any damage to ALADS." They say there is no substantial evidence that forming the shadow board and the competing website caused any damage to ALADS, and they say Attorney Baute's letter was protected by the litigation privilege. The evidence clearly established the duty, its breach and resulting damage. The creation of the shadow board and the competing website were part of the disarray and disruption defendants created for months. ALADS did not have to prove specific damages attributable to each disruptive action defendants undertook, as defendants appear to think.

The Baute letter was not protected by the litigation privilege. Defense counsel made no objection to its receipt in evidence. The privilege applies "to communications with 'some relation to a proceeding that is actually contemplated in good faith and under serious consideration . . . .'" (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194.) Defendants say this standard is met based on evidence of "the $100,000 retainer[] paid to Baute

37

and the admonition that board members or officers would be 'held [fully] accountable for any and all misconduct, to the fullest extent of the law.' "  The illegally obtained $100,000 retainer does not establish the necessary "good faith" contemplation of litigation.

### c.　Damages to ALADS Apart From the $7.8 Million

ALADS sought and obtained six categories of damages it incurred caused by defendants' breaches of fiduciary duty (apart from the damages caused to its members).  These were $46,677 in payments to acting executive director John Rees for work caused by defendants' misconduct; $25,769.20 in release time payments to the sheriff's department for Mr. Macias after his removal; $1,825.67 paid to three employees for time off taken as a result of defendants' actions; $465.75 in interest on the $100,000; $295.05 for staff time spent recovering the $100,000; and $158.31 for time spent by Mr. Rees and Mr. Steck stopping payment on the blank check.

　Defendants challenge each item, contending each one is not recoverable as a matter of law and, if it is, there is no substantial evidence supporting the award.  We disagree.

### i.　Mr. Rees's consulting fees

In late January 2014, ALADS hired John Rees as a consultant to temporarily act as executive director of ALADS.  He had previously worked for ALADS for many years and served as executive director for five years, before retiring and moving to San Diego in 2008.  He had anticipated his work would not extend beyond 60 days.  The day before Mr. Macias's removal, he was about to embark on preparations for negotiating a new MOU with the county.  All that changed after Mr. Macias's removal on March 7, 2014.

38

Mr. Rees's expected short stint with ALADS was extended through August 2014, during which time he acted as the "damage control person," to repair the damage to ALADS's relationships with the community, the staff, and the sheriff's office. (Will Aitchison, ALADS's expert on public safety labor organizations, testified this was the worst management dispute he had seen in any law enforcement labor organization; while he had seen many, "I've never seen anything like this.")

The trial court found that approximately 50 percent of Mr. Rees's time between March 17 and May 31, 2014, and 25 percent of his time between June 1 and December 31, 2014, "was spent attempting to manage the problems created by disruptions caused [by defendants'] breach of fiduciary duty." While Mr. Rees did not testify to those precise percentages, his testimony established that a substantial part of his time after Mr. Macias's removal was occupied, as the trial court put it, "trying to keep staff on task despite the difficulty of dealing with Defendants' conflicting demands and the confusion and stress caused by not knowing whose directives they were to follow and trying to maintain ALADS' essential relationships with third parties despite the confusion, turmoil and conflict created by [defendants'] efforts to seize control from the duly elected Board."

Mr. Rees testified that during the power struggle with the shadow board, he was almost continuously "out on the floor and in offices talking to people," trying to reassure employees and encourage them to come to him if they had any problems with conflicting directions and the like. He testified performing that task "definitely" took him away from his other duties, and this was so "[t]o a very significant degree." He described the "very long list" of duties from which he was taken away, including

preparation for the MOU negotiation.  The damages expert, Ted Vavoulis, testified to his calculation of the costs of Mr. Rees's salary and expenses for time devoted to mitigating the problems caused by defendants' conduct, assuming the 50 percent and 25 percent time allocations found by the trial court.

Defendants contend the expense of Mr. Rees's salary is not recoverable because it is "associated with corporate staffing decisions" and "related to litigation" and improper for the period after ALADS sued defendants.  Defendants cite no pertinent authority for these claims.  Defendants cite no evidence showing Mr. Rees's time was spent on litigation.

Then defendants contend there was no substantial evidence to support the 50 percent and 25 percent time allocations that Mr. Vavoulis used in his calculations, because he was told to assume those percentages.  But the trial court was entitled to conclude those were reasonable assumptions, given the testimony it heard about defendants' conduct and the nature and scope of Mr. Rees's work.  (See *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396–397 [" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.'  [Citation.]  'The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.' "].)

Finally, defendants say there was no substantial evidence of causation, contending "there is no legal certainty" that their breaches of fiduciary duty caused ALADS to incur the Rees consulting fees that were awarded.  We agree with ALADS that this claim is "almost comical," given the evidence we have described.

40

### ii.     Mr. Macias's release time

ALADS reimburses the county for the salaries of certain ALADS officers, to allow them to function full-time in that capacity (referred to as release time because they are released from their duties as deputy sheriffs).  ALADS paid the county $25,769.20 in release time for Mr. Macias for the period from his March 7 removal until the May 6, 2014 preliminary injunction preventing him from claiming to be president of ALADS.  Mr. Ipsen, purporting to act as general counsel for ALADS, had demanded those payments continue in his March 25, 2014 letter to the sheriff's department, copies of which he sent to many county, state and federal officials.  The county acquiesced.

Defendants claim there was no legal basis for awarding those damages, for several reasons.

Defendants say ALADS did not plead a claim for interference with contractual relations between ALADS and the county, and therefore cannot recover for the release time.  ALADS did not have to plead any other claim than breach of fiduciary duty to recover these damages.  As the trial court found, these were "payments that would not have been incurred by ALADS if [defendants] had not refused to comply with ALADS' Board's actions on March 7, 2014 removing Mr. Macias as a director and president and had not further breached their fiduciary duty in the conduct subsequent to his removal."

Defendants say the award results in an impermissible forfeiture of Mr. Macias's wages.  They are again mistaken. (*Service Employees International Union, Local 250 v. Colcord* (2008) 160 Cal.App.4th 362, 371 [referring to "the employer's legal right to recover salary and benefits previously paid to a faithless employee as damages or as restitution in a civil

41

lawsuit for breach of fiduciary duty"; the defendants' salaries and benefits were " 'damages directly flowing from the breach of defendants' fiduciary duties' "; affirming award to the union "of the costs it incurred in providing salary and benefits to [defendant employee] during the time he was organizing a competing union"].)

Defendants claim the demand for release time "was petitioning activity to the government and immune from liability under the *Noerr-Pennington* doctrine." Defendants do not trouble to explain the doctrine or make a reasoned argument about its application here, and we will not explain it for them. In any event, defendants hired Mr. Ipsen without board approval, and Mr. Ipsen demanded ALADS continue to reimburse the county for Mr. Macias's wages, misrepresenting that he (Mr. Ipsen) was acting on ALADS's behalf as its general counsel. These were not protected actions; they were breaches of fiduciary duty.

Finally, defendants argue Mr. Nance cannot be liable for release time payments for Mr. Macias because there was no evidence he (Mr. Nance) authorized or knew about the Ipsen letter. The trial court found otherwise, concluding both defendants "authorized and/or ratified Mr. Ipsen's sending of the March 25, 2014 letter." The trial court could readily infer from all the evidence that Mr. Ipsen was acting for both defendants, and that Mr. Nance authorized the Ipsen letter. Mr. Nance participated in all the conduct preceding the Ipsen letter, including the misappropriation of ALADS's funds and creating the shadow board by purportedly electing a new director in a meeting without a quorum. The Ipsen letter, in addition to requesting confirmation of Mr. Macias's release time, likewise demands Mr. Nance's "full time 'release time' not be changed."

The trial court reasonably concluded Mr. Nance was equally responsible for the breaches of fiduciary duty that caused ALADS to incur the release time damages.

### iii.    Sick leave

The trial court found that "at least three employees, [Ms.] Silvestre, Ms. Zamudio, and Lucy Hayhurst, took paid time off at ALADS's expense . . . as [a] direct result of the threats and stressful environment created by Defendants' conduct in refusing to acknowledge Mr. Macias's removal . . . and Defendants' subsequent efforts to seize control of ALADS in violation of its Bylaws."  The total amount was $1,825.67.

Defendants argue that "[e]mployee expenses are not recoverable as damages."  They cite no authority for this proposition, and we are aware of none.  Damages incurred as a result of a breach of fiduciary duty are recoverable.  (*Meister v. Mensinger, supra,* 230 Cal.App.4th at p. 396.)

Defendants say the award is not supported by substantial evidence.  This is wrong, too.  We have already recounted Ms. Silvestre's testimony that after defendants' demand for signature cards, she felt sick, went home early, and did not return to work for the next two days.  Her doctor advised her not to go to work "for a couple of days, at least."  She attributed this to worry about losing her job.  Records showed Ms. Hayhurst "went home sick," and Mr. Rees testified to his understanding that "[t]he stress was too much for [Ms. Hayhurst] to stay at work," accounting for her absences in April 2014.  Office manager Cindy Flores presented records showing Ms. Zamudio's absences in March 2014, annotated "stress."  ALADS's damages expert calculated the cost to ALADS for paying the employees despite the work time lost.  All this constitutes substantial evidence.

43

### iv. Damages for stopping payment ($158.31) and recovering the $100,000 ($295.05)

The trial court stated that "ALADS presented evidence that it spent $158.31 for both Mr. Rees's time and for ALADS' then-President Don Jeffery Steck's time stopping payment on the blank check that [defendants] attempted to use in retaining Mr. Baute's services to assist them. ALADS also incurred costs associated with [defendants'] misappropriation of the $100,000 from ALADS' State PAC account. ALADS presented evidence that it incurred costs of $295.05 for staff time spent recovering the $100,000."

Defendants say neither of these two amounts was supported by substantial evidence. Derek Hsieh (executive director at the time of trial) presented Mr. Rees's time sheet, showing an entry on March 17, 2014 (the date defendants took the blank check), for a 44-minute telephone conference with Mr. Steck. Mr. Hsieh also testified to a 38-minute telephone call the following day between Mr. Rees and Mr. Steck. Mr. Hsieh calculated the costs for Mr. Steck's and Mr. Rees's time for both conversations (March 17 relating to the stop-payment, and March 18 relating to recovering the $100,000). The total cost for Mr. Steck's time for both conversations was $124.19, and for Mr. Rees the total for both was $170.24, "so it would be the summation of those two," which he said was $295.05.

Our review of the evidence shows that the time spent on stopping payment on the blank check (the March 17 conversation, totaling $158.31 for time spent by Mr. Rees and Mr. Steck), was mistakenly *also* added to the time they spent the following day on recovering the $100,000, thus double-counting $158.31. The time

44

they spent recovering the $100,000 amounted to $136.74, not $295.05.

Defendants argue there was no evidence about the subject matter of the telephone conferences Mr. Rees and Mr. Steck had on March 17 and March 18. That is not the case. Mr. Hsieh testified, under questioning by defense counsel, that he knew Mr. Rees and Mr. Steck had both conversations and what they were about, because he asked Mr. Rees about them.

In sum, substantial evidence supports these items of damages to ALADS, but we will deduct the double-counted $158.31 from the award.

### d.     ALADS's PAC account:  standing

Defendants contend ALADS did not own the PAC account and therefore did not have standing to sue to recover the $100,000 withdrawn from that account. So, they say, ALADS was not entitled to the award of interest ($465.75) or the award of the cost of staff time spent recovering the funds.

Defendants cite *Killian v. Millard* (1991) 228 Cal.App.3d 1601, 1605, which tells us that "only parties with a real interest in a dispute have standing to seek its adjudication." Defendants do not explain why we should conclude ALADS has no "real interest in [this] dispute." (*Ibid*.) The evidence showed that ALADS owns and controls the funds. Mr. Hayhurst testified to the effect that the PAC is funded by contributions from ALADS members. Ms. Silvestre testified the PAC account was "one of ALADS' accounts." ALADS's complaint, which defendants themselves quote, describes the PAC, "through which ALADS makes various contributions to state political candidates and causes." No evidence was presented to suggest that ALADS did not control the account. The fact that the funds were designated

45

for use by the PAC does not change ALADS's ownership and control of the funds. ALADS clearly had standing to recover them.

### e. Injunctive and declaratory relief

In addition to the award of damages, the judgment declared that Mr. Macias was properly removed on March 7, 2014, and that neither defendant is entitled to indemnification under section 6.14 of the ALADS bylaws for any costs or fees they incurred in defending this lawsuit. As mentioned earlier, both defendants were enjoined from representing they are officers or directors of ALADS, from entering the ALADS offices, and from accessing any financial accounts held by or for the benefit of ALADS. The conduct enjoined essentially reflects similar terms in the preliminary injunction issued in May 2014.

" 'A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action . . . against a defendant and that equitable relief is appropriate.' " (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390 (*Horsford*).) Its grant or denial "will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Ibid.*)

Defendants argue the court abused its discretion in granting a permanent injunction and the declaratory relief on which the injunction was based. They point out that defendants are retired, and at the time of trial, "there was no evidence of an ongoing controversy or recurring conduct," so there was no likelihood of future harm in the absence of a permanent injunction.

ALADS was forced to seek, and obtained, a preliminary injunction to prevent defendants' conduct. The case was hard

46

fought before and during trial.  We see nothing inappropriate or inequitable about making the preliminary relief ALADS obtained a part of the judgment, even if it is unlikely that defendants will engage in the prohibited conduct in the future.  As ALADS points out, the evidence showed defendants caused substantial detriment to the organization, and the equitable relief granted is directly tied to the facts and breaches of fiduciary duty established at trial.  Under these circumstances, we will not disturb the trial court's implicit determination that " 'equitable relief is appropriate.' " (*Horsford, supra,* 132 Cal.App.4th at p. 390.)[9]

> **f.     The indemnity claim**

Mr. Nance filed a cross-complaint seeking indemnity under section 6.14 of the ALADS bylaws for his costs and attorney fees incurred in defending the action.   Section 6.14 provides for indemnity of a director, officer or employee who is sued "*if*: (1), the person sued is successful in whole or in part . . . ; *and* (2), the court finds that his/her conduct fairly and equitably merits such indemnity."  (Italics added.)  The trial court concluded that neither of those requirements was met, and further concluded that "[t]here would be nothing fair or equitable in permitting Mr. Nance to further injure ALADS and its members by insisting that ALADS now bear the financial costs of his conduct."

The trial court did not err in entering judgment against

---

[9]     Defendants also contend the injunctive relief is an impermissible prior restraint on speech.  It is not.  Defendants are enjoined from representing they are officers or directors of ALADS; the judgment does not (as they assert) "restrict[] what [they] could say about their tenure at ALADS."

Mr. Nance on his cross-complaint for indemnity, as his defense of the suit was unsuccessful.

Defendants also contend the trial court erred in decreeing in the judgment that Mr. Macias is not entitled to indemnification because, unlike Mr. Nance, Mr. Macias did not assert a claim for indemnity. We see no reason to amend the judgment on that account. Under the circumstances of this case, it was neither unjust nor improper for the court to decree that Mr. Macias cannot be indemnified for his costs and fees defending this case. Clearly, he cannot be indemnified, and a decree stating the obvious is an appropriate exercise of the trial court's equity powers. (Cf. *People v. Superior Court* (1973) 9 Cal.3d 283, 286 ["a court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties"].)

## DISPOSITION

The judgment is amended to change the amount of damages awarded, adding $7,813,833 in damages for the compensation lost by ALADS's members due to the delay in negotiations caused by defendants' breach of fiduciary duty, and subtracting $158.31 for which there was no evidence. The judgment as amended is affirmed. The postjudgment order denying costs of proof is reversed and the cause is remanded for determination of the reasonable fees and costs incurred to prove matters defendants failed to admit without reasonable ground to believe they would prevail. ALADS shall recover its costs on appeal.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.        WILEY, J.

48